IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KELVIN MERRITT, | ) | |
| #B78207, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 11-cv-706-MJR |
| vs. | ) | |
| | ) | |
| LT. WILLIAMS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

REAGAN, District Judge:

Plaintiff Merritt, an inmate in Pontiac Correctional Center, brings this action for

deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983, based on an incidents that

occurred while Plaintiff was housed at Pinckneyville Correctional Center. Plaintiff is serving a

45-year sentence for murder and a 15-year sentence for attempted armed robbery. This case is

now before the Court for a preliminary review of the complaint pursuant to 28 U.S.C. § 1915A,

which provides:

> **(a) Screening.**— The court shall review, before docketing, if feasible or, in any
> event, as soon as practicable after docketing, a complaint in a civil action in which
> a prisoner seeks redress from a governmental entity or officer or employee of a
> governmental entity.
> **(b) Grounds for Dismissal.**— On review, the court shall identify cognizable
> claims or dismiss the complaint, or any portion of the complaint, if the com-
> plaint—
>> **(1)** is frivolous, malicious, or fails to state a claim upon which re-
>> lief may be granted; or
>> **(2)** seeks monetary relief from a defendant who is immune from
>> such relief.

An action or claim is frivolous if "it lacks an arguable basis either in law or in

fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). An action fails to state a claim upon which

relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept factual allegations as true, *Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011), some factual allegations may be so sketchy or implausible that they fail to provide sufficient notice of the plaintiff's claim, *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks*, 578 F.3d at 581. At the same time, however, the factual allegations of a pro se complaint are to be construed liberally. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir.2009).

Upon careful review of the complaint and exhibits, the Court finds it appropriate to exercise its authority under § 1915A; portions of this action are subject to summary dismissal.

**The Complaint**

These allegations are taken from Plaintiff's pro se complaint (Doc. 1). On August 11, 2009, Plaintiff signed a money voucher to see a nurse in sick call. He explained to the nurse that he had a chronic sinus infection and needed to see a doctor for antibiotics. He said he had polyps and a deviated septum, which cause his nose to drain backwards and fluid to build up and infect his glands and throat. The nurse said she would try to get him to see a doctor soon. She gave him ten cold tablets to dry up his fluids, and Tylenol for any pain caused by the cold tablets. When Plaintiff tried to ask about his infected toes, however, the nurse told him he would have to come back. Plaintiff never saw a doctor or received antibiotics.

On August 14, 2009, Plaintiff signed another $2 copay and went to sick call. He showed the nurse his big toes, which were discolored black and green. The right big toe was bloody and half the toenail was hanging. Plaintiff explained that his foot was in pain and his toes were numb. Plaintiff also suffered from foot fungus. The nurse would not touch Plaintiff's feet with gloves on. She put in an emergency request to see a doctor. She did not treat the toes, however, and Plaintiff never saw a doctor. Two weeks later, he says, "I was forced to tear off toe nails myself with only fingers and tear all infected flesh from wound in fear of infection spreading" (Doc. 1, p. 14).

On August 22, 2009, Plaintiff again signed a $2 copay to see a doctor. In the medical room, Plaintiff saw Nurse Lucas and told her he had written the Healthcare Administrator that he needed to see a doctor about his sinus infection and toe infections. He explained that he had already seen nurses who signed up him to see doctors, but that he hadn't received any treatment. Lucas said he would have to wait to see a doctor and she could not do anything to treat him. Plaintiff asked why they continued to take his money then. Lucas said to file a grievance. In response, Plaintiff asked for a crisis team.[1] Lucas told him, "We'll send one after you kill yourself" (Doc. 1, p. 14). C/O Drue then escorted Plaintiff out of the room.

When Plaintiff asked Drue for a crisis team, Drue informed Lt. Williams, who sent over eight officers. C/Os Allen and Hicks grabbed Plaintiff's arms, handcuffed them behind his back, and forced them up, popping Plaintiff's left shoulder. C/Os Allen, Hicks, Drue, Hill, Redding, and others lifted Plaintiff off the ground to take him up the stairs. Plaintiff continued asking for a crisis member. Hicks kneed Plaintiff in his left rib cage. Allen tried to hold onto the handcuffs and force Plaintiff's hands through the food slot while others twisted his fingers. The

---

[1] There are three reasons for going on "crisis watch," Plaintiff says: (1) suicide thoughts, (2) feeling like hurting others, and (3) when you can't adapt to an environment. He does not explain why he asked for a crisis team at that time.

handcuffs and food slot cut deep into Plaintiff's arms and wrist. Hicks kneed Plaintiff's rib cage again and kicked his left leg. The officers removed the handcuffs and left, leaving Plaintiff with his arms and hands swollen, cut, and bloody; and, Plaintiff alleges, a broken thumb.

Nurse Lucas passed by then, and Plaintiff told her his thumb was broken. She replied, "Good for you," and walked off (Doc. 1, pp. 8, 15). Plaintiff says she saw the incident and refused him medical treatment.

At three o'clock that afternoon, Plaintiff again asked for a crisis member. Lt. Skorza came to the cell and told Plaintiff to wait. At his four o'clock dinnertime, Plaintiff declared a hunger strike. Skorza returned and removed him from the cell. On seeing Plaintiff's injuries, Skorza said, "You're really not getting any medical treatment now," and took Plaintiff to segregation (Doc. 1, p. 8). Plaintiff also asserts that at this same time, four o'clock, he placed himself on crisis watch "to seek protection and medical treatment" because of the assault and because he had been denied a crisis member. At segregation, officers stripped Plaintiff's clothes off and put him in a cell without a mattress. (The Court will discuss the cell conditions in segregation below.)

Plaintiff told C/O Dilla he needed medical treatment. Dilla, who had observed Plaintiff's injuries when his clothes were taken, said Plaintiff would have to wait until nine o'clock when the nurses distributed medication. A nurse passed by at nine o'clock, but denied Plaintiff medical treatment.

The next day, August 23, 2009, at seven in the morning, Plaintiff showed C/O Penland his injuries. Penland called health care, and Nurse Melvin came. Melvin explained that he could not receive medical care until he came off crisis watch. Plaintiff later received a copay receipt for Melvin's visit even though she had not given him any treatment. On August 24, 2009,

Plaintiff saw Warden Schwartz on the gallery. Plaintiff told Schwartz about the assault and about his injuries, including his broken thumb, and that he was not receiving medical treatment. Schwartz asked Nurse Melvin, "Is this him?" (Doc. 1, p. 9). Schwartz said he would talk to Plaintiff after he finished talking to an inmate on hunger strike, but never returned.

On August 25, 2009, Plaintiff showed his injuries to C/O Lafayette, who called Nurse Karen Cassell to the unit. In the shower area, Lafayette and Cassell and another officer observed Plaintiff's injuries. Cassell saw all of Plaintiff's physical injuries, including all the cuts on his arms from the assault. She also saw that Plaintiff's thumb was swollen. Plaintiff told her he couldn't feel or move his thumb. Plaintiff then told her about his chronic sinus infection and toe infections. Cassell said a sinus infection is a sick-call issue. She said she couldn't do anything about his toes. Plaintiff showed her a "rash on his groin area," at which time Cassell "came with an attitude and tried to leave" (Doc. 1, p. 16). When Plaintiff challenged her ("So you are not going to give me anything?"), Cassell said she could give him cream for his groin area and Tylenol for his injuries. Plaintiff asked for X-rays for his hand. Cassell said he could not get X-rays while on crisis watch. She gave him Tylenol for three days.

Plaintiff spoke to psychologist Ty Wallace about the assault and asked him to contact Internal Affairs. Regarding his need to be on crisis watch, Plaintiff told Wallace he felt like he might hurt someone and that he could not adapt to his surroundings, due to the assault. Later that day, Plaintiff asked Wallace again to contact Internal Affairs about the assault. He began seeing another psychologist as well, Tracy Stevenson. Plaintiff inquired about the cell conditions in segregation, and Stevenson stated that inmates on crisis watch did not receive showers or hygiene products and that security had the responsibility of cleaning the cells.

On August 26, 2009, Wallace secretly took Plaintiff off crisis watch. Defendants Hicks and Penland came to remove Plaintiff from segregation. Plaintiff asked for Wallace, who arrived 15 minutes later. Wallace told Plaintiff he did not need to be on crisis watch and was simply stressed. Plaintiff disputed that, telling Wallace he knew the difference between stress and the thoughts in his mind. "Minutes later," Penland wrote Plaintiff a false inmate disciplinary report. Plaintiff was put back on crisis watch. (The Court will describe this incident below in the course of Plaintiff's due-process claim.)

Plaintiff discussed the assault and his lack of medical treatment with multiple staff members, including C/Os Cocke, Heck, and Rolla, Lt. Jordan, and psychologist Stevenson. Jordan and Stevenson said Plaintiff had to come off crisis watch to receive medical treatment. Stevenson promised to talk to Internal Affairs, and Wilson told Plaintiff to file a grievance. Plaintiff asked counselors Lewtz and Dolce to assist him in contacting Internal Affairs about the assault and lack of medical treatment. They responded that they had talked to Lt. Bradley about it but were not sure whether there would be an investigation. Lt. Furlowe, a member of Internal Affairs, visited Plaintiff. Plaintiff explained the assault to him, but Furlowe said he could not change Plaintiff's cell assignment or question other officers. Plaintiff needed to wait until Lt. Bradley returned on Monday. Furlowe promised to write all the information down for Bradley. Plaintiff told Assistant Warden Wilson "all the above." Wilson told Plaintiff to file a grievance. He also asked how Plaintiff knows Internal Affairs is not investigating. Plaintiff believes Internal Affairs never investigated the assault.

On August 29, 2009, Plaintiff told an unknown nurse he was being denied treatment by nurses on the 7-3 shift and had not been able to see a doctor. He told her that according to nurses Melvin and Gale inmates on crisis watch could not see a doctor or sign up for sick call.

But this nurse had signed up several inmates on crisis watch for sick-call. She did so for him as well. The next day, on August 30, Nurse Gale came and was angry. She said she would only refer him for X-rays on his right thumb and nothing else (Doc. 1, p. 16).

On September 2, 2009, Plaintiff saw Dr. Obadina. Obadina saw Plaintiff's injuries and asked what happened to his arms and hands. He ordered X-rays be taken on Plaintiff's hand "right now" (Doc. 1, p. 17). Obadina did not treat Plaintiff's other medical issues. He prescribed ibuprofen to Plaintiff for pain and sent the X-rays to a radiologist. On or around September 10, 2009, Plaintiff saw Dr. Schafer. Schafer gave Plaintiff his X-ray results and ordered stronger pain medication. (Plaintiff does not say what the results were.) He talked to Schafer about his eye infection and about his chronic sinus infection. He said he was coughing up mucus and blood, and it was hard to swallow. Nurse Gale stopped him, saying "That's it," and called C/O Penland to escort Plaintiff back to his cell (Doc. 1, p. 18).

**Discussion**

The Court divides this pro se action into five counts based on Plaintiff's allegations and the arrangement of the complaint. The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed. The designation of these counts does not constitute an opinion as to their merit.

Before moving on to the counts, the Court notes that Plaintiff names Defendants Hill and Benton in the caption of his complaint without discussing them elsewhere. The Court is unable to ascertain what claims, if any, Plaintiff has against these Defendants. Merely invoking the name of a potential defendant is not sufficient to state a claim against that individual. *See Collins v. Kibort*, 143 F.3d 331, 334 (7th Cir.1998). Because Plaintiff has not discussed Defend-

ants Hill and Benton elsewhere in his complaint, he does not adequately state claims against them, and they are dismissed without prejudice.

**Count 1: Excessive Force**

Plaintiff alleges he was assaulted by C/Os Hicks, Allen, Redding, Drue, Hill "and several others" (Doc. 1, p. 11). The intentional use of excessive force by prison guards against an inmate without penological justification constitutes cruel and unusual punishment in violation of the Eighth Amendment and is actionable under § 1983. *See Wilkins v. Gaddy*, 130 S.Ct. 1175 (2010); *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). An inmate must show that an assault occurred and that "it was carried out 'maliciously and sadistically' rather than as part of 'a good-faith effort to maintain or restore discipline.'" *Wilkins*, 130 S.Ct. at 1180 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). An inmate seeking damages for the use of excessive force need not establish significant injury to state a claim. *Id.* at 1178.

Here, when Plaintiff asked for a crisis team, Lt. Williams sent over eight officers. Allen and Hicks grabbed Plaintiff's arms and popped his left shoulder. Hicks kneed him in his rib cage twice and kicked him in the leg. Allen tried forcing Plaintiff's hands through the food slot while others twisted his fingers and handcuffs, cutting Plaintiff's arms and wrist deeply. Plaintiff says his arms and hands were swollen, cut, and bloody. These facts do not indicate that the officers' actions were part of a good-faith effort to maintain or restore discipline. Therefore, Plaintiff's claim for use of excessive force against C/Os Allen, Hicks, Drue, Hill, and Redding cannot be dismissed at this time.

Though Plaintiff names Lt. Williams as a defendant, he does not plead facts establishing a claim against him. To state a claim in a § 1983 action, a plaintiff must establish that the

defendant was personally responsible for the deprivation of a constitutional right. *E.g.*, *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir.2001); *George v. Smith*, 507 F.3d 605, 609 (7th Cir.2007). Plaintiff says only that Williams sent over the eight officers. He does not allege that Williams instructed the officers to harm him or that Williams participated. Similarly, Plaintiff names wardens Schwartz and Wilson and lieutenants Bradley, Jordan, and Skorza as defendants. He may also be bringing a claim against Lt. Furlowe and counselors Wallace and Stevenson. Plaintiff told these individuals about the assault, but they did not order an investigation by Internal Affairs or give him medical treatment. He does not allege any of them personally assaulted him, however. Failure to investigate does not cause or participate in the violation. Count 1 is therefore dismissed without prejudice as to Defendants Williams, Schwartz, Wilson, Bradley, Jordan, Skorza, Furlowe, Wallace, and Stevenson.

**Count 2: Deliberate Indifference to Serious Medical Needs**

Plaintiff alleges that nurses Melvin, Gale, Cassell, Lucas, Little, and Hill denied him medical treatment to help cover up the assault on Plaintiff, and that doctors Obadina and Schafer refused to treat medical issues other than his right hand (broken thumb). He believes all these defendants were deliberately indifferent to his serious medical needs.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but stops short of "negligen[ce]

in diagnosing or treating a medical condition." *Estelle*, 429 U.S. at 106; *see also Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir.2001).

> To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). Deliberate indifference involves a two-part test. The plaintiff must show that (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard.

*Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir.2000).

The Seventh Circuit considers the following to be indications that a medical condition is objectively serious: (1) where failure to treat the condition could "result in further significant injury or the unnecessary and wanton infliction of pain"; (2) the "[e]xistence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment"; (3) the "presence of a medical condition that significantly affects an individual's daily activities"; or (4) the "existence of chronic and substantial pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (internal quotations and citations omitted).

Regarding the subjective standard of deliberate indifference, the Supreme Court stressed it is not an insurmountable hurdle:

> [A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm … . Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence … and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer*, 511 U.S. at 842. The Seventh Circuit's decisions following this standard for deliberate indifference in the denial or delay of medical care require evidence of a defendant's actual knowledge of, or reckless disregard for, a substantial risk of harm. See *Chavez v. Cady*, 207 F.3d

901, 906 (7th Cir.2000) (officers were on notice of seriousness of condition of prisoner with rup-
tured appendix because he "did his part to let the officers know he was suffering"). Inadvertent
error, negligence, or even ordinary malpractice is insufficient to rise to the level of an Eighth
Amendment constitutional violation. See *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th
Cir.2008).

       Here, Plaintiff mentions several medical problems: a chronic sinus infection, an
eye infection, toe infections, and a broken thumb and other injuries from the assault.

       Regarding the chronic sinus infection, Plaintiff says he has polyps and a deviated
septum that cause his nose to drain backwards and fluid to build up, which infects his glands and
throat. A nurse gave Plaintiff ten cold tablets to dry up his fluids, and Tylenol for any pain
caused by the cold tablets. She would try to have him see a doctor soon. Nurse Cassell, however,
told Plaintiff that a sinus infection is a sick-call issue. Plaintiff told Dr. Schafer he was coughing
up mucus and blood, and that it was hard to swallow. Based on these facts, it does not appear that
failure to treat the sinus infection resulted in further significant injury or the unnecessary and
wanton infliction of pain. Plaintiff does not allege the existence of chronic and substantial pain.
The only pain was caused by the cold tablets. Likewise, Plaintiff scarcely mentions the eye infec-
tion. He says he was put on an emergency list to see an eye doctor when he arrived at Pinckney-
ville. His sinus infection was allegedly causing an eye infection in his artificial eye that made the
eye socket yellowish. During most of his visits to nurses and doctors, however, Plaintiff does not
mention an eye infection. He only apparently brought it up with Schafer while getting X-ray re-
sults. Plaintiff does not allege any pain or further injury, let alone further significant injury. The
Court does not find, on the facts alleged, that Plaintiff's chronic sinus infection or his eye infec-
tion were objectively serious medical conditions.

Plaintiff says a nurse (unnamed) refused to treat his infected toes on August 14, 2009. His big toes were discolored black and green. The right toe was bloody and half the toenail was hanging. His foot was in pain and his toes were numb. The nurse refused to touch Plaintiff's feet and put in an emergency request to see a doctor. Two weeks later he tore off his toe nails with his fingers and tore the infected flesh from the wound to prevent infection from spreading. The Court finds that the nurse's emergency request indicates a reasonable doctor or patient would find Plaintiff's toe infection important and worthy of treatment. Further, although Plaintiff does not allege he was in chronic or substantial pain, he says his toes were numb, which may explain the absence of pain. The Court finds this claim merits further review.

Plaintiff also incurred a broken thumb and deep cuts on his arms and wrists from the assault by Allen, Hicks, Drue, Hill, and Redding. The broken thumb meets the standard for a serious medical need, according to the *Gutierrez* factors. Failure to treat a broken bone can lead to serious complications and excessive pain. A reasonable physician or patient would find the injuries worthy of treatment, as evidenced by Obadina's decision to order an X-ray "right now." Finally, Plaintiff experienced substantial pain from the injuries. Schafer prescribed him stronger pain medication. Plaintiff has pled sufficient facts about at least his broken thumb to fulfill the objective part of a claim for deliberate indifference.

*Nurse Lucas*

Plaintiff saw Nurse Lucas on August 22, 2009. He told her he had written the Healthcare Administrator that he needed to see a doctor about his chronic sinus infection and infected toes. He explained that he had already seen nurses who signed up him to see doctors, but that he hadn't received treatment. Lucas said he would have to wait to see a doctor and she could

not do anything to treat him. At this point, Lucas evidently believed Plaintiff needed to see a doctor. The Court finds that she had actual knowledge of Plaintiff's serious medical condition, his infected toes. After that, Plaintiff was assaulted and left in his cell. Plaintiff claims Lucas saw the assault and that he told her his thumb was broken. She responded, "Good for you," and walked off. Based on these allegations, the Court finds that Lucas had actual knowledge of Plaintiff's broken thumb. She refused to give him treatment herself and did not arrange for Plaintiff to see a doctor. Yet a week later, Nurse Gale referred Plaintiff to a doctor for X-rays on his thumb. And Dr. Obadina ordered X-rays "right now." The Court finds that Plaintiff's claim against Nurse Lucas merits further review.

*C/O Penland, Nurse Melvin, and Warden Schwartz*

When Plaintiff showed C/O Penland his injuries, Penland called health care. Nurse Melvin responded. She told Plaintiff he could not receive medical care until he came off crisis watch. As to Penland, the Court believes he acted reasonably by contacting health care; he did not deny Plaintiff medical treatment. Plaintiff does not specifically allege that Melvin knew about his broken thumb, but it is difficult to understand how she could not have: That was why Plaintiff was asking for medical treatment at that time, and why Penland had called her. And she was there when Plaintiff told Warden Schwartz about his injuries (Schwartz asked Melvin, "Is this him?"). Further, Plaintiff was referred for X-rays the next week even though he was still on crisis watch. Plaintiff's claim against Nurse Melvin merits further review. Plaintiff does not state a claim of deliberate indifference against Melvin for his toe infections, however, since he did not mention them to her.

Plaintiff saw Warden Schwartz on the gallery and told him about the assault and about his injuries, including his broken thumb, and that he was not receiving medical treatment. Schwartz said he would talk to Plaintiff after he finished talking to an inmate on hunger strike, but never returned. It is quite possible Schwartz was only negligent in forgetting to come back. Nevertheless, on preliminary review of the complaint, the Court finds that this claim against Schwartz merits further review.

*C/O Lafayette and Nurse Cassell*

Two days later, on August 25, Plaintiff showed his injuries to C/O Lafayette, who called Nurse Cassell to segregation. They took Plaintiff to the showers and observed his injuries. Cassell saw the cuts on his arms and that his thumb was swollen, and Plaintiff told her he could not move or feel his thumb. He also told Cassell about his toe infections. She said she could not do anything about his toes and told Plaintiff he could not receive X-rays on crisis watch. She offered him three days' worth of Tylenol for the pain from his injuries.

C/O Lafayette acted reasonably by contacting health care when he saw Plaintiff's injuries. Plaintiff therefore does not state a claim against him. Cassell, on the other hand, did not order X-rays for Plaintiff's thumb, even though it was swollen and he told her he could not move or feel it. Plaintiff's being on crisis watch is not a reason for refusing medical treatment. She also did not do anything for Plaintiff's toe infections. Plaintiff's claim against Cassell merits further review.

*Nurse Gale*

After an unknown nurse signed Plaintiff up for sick call on August 29 for his injuries, Nurse Gale visited Plaintiff and told him she would only refer him for X-rays on this right thumb. She was also present when Dr. Obadina asked Plaintiff about the injuries on his arms and hands, and then ordered X-rays. She was present again when Dr. Schafer gave Plaintiff his X-ray results and prescribed him stronger pain medication. Plaintiff told Schafer about his eye infection and chronic sinus infection, but Gale interrupted, "That's it," and called an officer to take Plaintiff away.

The Court finds that Gale referred Plaintiff to a physician regarding his objectively serious medical condition, his broken thumb. She did not examine Plaintiff, and at no point did Plaintiff mention his toe infection while she was there. Plaintiff's claim for deliberate indifference against Gale is dismissed without prejudice.


*Doctors Obadina and Schafer*

Plaintiff saw Dr. Obadina on September 2. He saw Plaintiff's physical injuries and asked what happened to his arms and hands. He ordered X-rays be taken "right now" for Plaintiff's broken thumb and prescribed ibuprofen. When Plaintiff tried to bring up his other medical issues, Obadina said he was only there for his hand. Plaintiff said he had been referred for doctor's appointments three times before and had not been seen, but Obadina did not offer treatment. A week and a half later, Dr. Schafer gave Plaintiff his X-ray results and ordered stronger pain medication. Plaintiff told Schafer about his chronic sinus infection and that he was coughing up mucus and blood, and it was hard to swallow. Nurse Gale interrupted and had Plaintiff escorted away.

Both doctors treated Plaintiff's broken thumb. His claim here is that they refused to treat his *other* serious medical issues, though. But Plaintiff does not say whether he mentioned his toe infections to either doctor. He says only that he tried to bring up other "medical issues." He only talked to Schafer about his eye infection and about his chronic sinus infection. The Court does not find that Plaintiff has stated a claim for deliberate indifference against either Dr. Obadina or Dr. Schafer. They are dismissed without prejudice.

**Count 3: Conditions of Confinement**

Throughout his time in segregation, from August 22–September 22, 2009, Plaintiff lived in cells with urine, feces, and blood soiled the walls, floors, and bed. There were bugs and ants in one cell. Water leaked from the toilet and sink onto the floor. Plaintiff eventually received a mattress and a pair of boxers from Stevenson. The staff allowed him no mail or property. He ate with his dirty hands due to the lack of utensils. Plaintiff was not permitted to receive basic hygiene products or allowed to shower for the 30-day period. He discussed this with Defendants Stevenson, Wallace, Jordan, Penland, Dilla, Furlowe, Wilson, Melvin, Furlowe, Cassel, and Gale. None of them assisted him.

The Eighth Amendment's prohibition on cruel and unusual punishment is applicable to the states through the Fourteenth Amendment. It has been a means of improving prison conditions that were constitutionally unacceptable. *See, e.g.*, *Robinson v. California*, 370 U.S. 660, 666 (1962); *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994). As the Supreme Court noted in *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981), the Eighth Amendment reaches beyond barbarous physical punishment to prohibit the unnecessary and wanton infliction of pain and punishment grossly disproportionate to the severity of the crime. *Id.* (citing *Gregg v. Georgia*,

428 U.S. 153, 173 (1976)). The Constitution also prohibits punishment that is totally without pe-

nological justification. *Gregg*, 428 U.S. at 183.

Not all prison conditions trigger Eighth Amendment scrutiny—only deprivations

of basic human needs like food, medical care, sanitation, and physical safety. *Rhodes,* 452 U.S.

at 346; *see also James v. Milwaukee Cnty.*, 956 F.2d 696, 699 (7th Cir. 1992). To prevail on a

conditions-of-confinement claim, a plaintiff must allege facts that, if true, would satisfy the ob-

jective and subjective components applicable to all Eighth Amendment claims. *McNeil v. Lane,*

16 F.3d 123, 124 (7th Cir. 1994); *see also Wilson v. Seiter,* 501 U.S. 294, 302 (1991). The objec-

tive component focuses on the nature of the acts or practices alleged to constitute cruel and unu-

sual punishment. *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir. 1992). It examines whether the

conditions of confinement "exceeded contemporary bounds of decency of a mature, civilized so-

ciety." *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir. 1994). The condition must result in un-

questioned and serious deprivations of basic human needs or deprive inmates of the minimal civ-

ilized measure of life's necessities. *Rhodes*, 452 U.S. at 347; *accord Jamison-Bey v. Thieret*, 867

F.2d 1046, 1048 (7th Cir. 1989); *Meriwether v. Faulkner*, 821 F.2d 408, 416 (7th Cir 1987).

The subjective component focuses on the intent with which the acts or practices

constituting the alleged punishment are inflicted. *Jackson*, 955 F.2d at 22. It requires that the

prison officials had a sufficiently culpable state of mind. *See Wilson*, 501 U.S. at 298; *McNeil*, 16

F.3d at 124. In conditions-of-confinement cases, the relevant state of mind is deliberate indiffer-

ence to inmate health or safety; the official must be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he also must draw the infer-

ence. *See, e.g.*, *Farmer*, 511 U.S. at 837; *Wilson*, 501 U.S. at 303; *Estelle v. Gamble*, 429 U.S.

97, 104 (1976); *DelRaine v. Williford*, 32 F.3d 1024, 1032 (7th Cir. 1994). A failure of prison of-

ficials to act in such circumstances suggests they actually want the prisoner to suffer the harm. *Jackson*, 955 F.2d at 22. It is well settled that mere negligence is not enough. *See, e.g.*, *David v. Cannon*, 474 U.S. 344, 347–48 (1986).

Here, blood, feces, and urine soiled the walls, floors, and bed of Plaintiff's first cell in segregation, where he arrived on August 22, 2009. There were bugs and ants in the cell. The second cell had urine and feces on the walls and water leaked from the toilet and sink onto the floor. Plaintiff was not permitted to take a shower for 30 days. Unsanitary conditions similar to those described by Plaintiff have been found to state a claim under the Eighth Amendment. *See Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (prisoner held in cell for three to six days with no working sink or toilet, floor covered with water, and walls smeared with blood and feces); *Jackson v. Duckworth*, 955 F.2d at 22 (summary judgment improper where inmate alleged he lived with "filth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, . . . [and] unfit water to drink[.]"); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (inmate held for three days in cell with no running water and feces smeared on walls); *see also DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (thirty-six hours with no working toilet, flooded cell and exposure to human waste as well as the odor of accumulated urine, stated Eighth Amendment claim). Accordingly, the Court finds that the unsanitary and hazardous conditions described in Plaintiff's complaint meet the objective component of a constitutional violation.

As to the subjective component, Plaintiff told C/O Dilla and Lt. Skorza that his cell needed to be cleaned, and Skorza replied, "This is what you asked for." C/O Penland told Plaintiff the cells were not allowed to be cleaned. Later, when Plaintiff was telling Penland about the conditions, Penland just said to "get in the cell." Staff refused to provide hygiene products or

allow Plaintiff to shower during the 30-day period, stating that they did not allow these amenities for inmates on crisis watch. When asked about cell conditions, Stevenson told Plaintiff that it was security's responsibility to clean the cells. Plaintiff also spoke to Defendants Jordan, Dilla, Furlowe, Wilson, Melvin, Cassell, Gale, and Wallace. Each responded that Plaintiff needed to come off crisis watch. Wallace said "if [he] didn't like the cell conditions [he] should hurry and get off watch" (Doc. 1, p. 24). The court may draw the reasonable inference that each of these Defendants knew of the substantial risk of serious harm created by the cells' conditions and failed to take measures to mitigate that risk. Thus, Plaintiff's allegations could amount to a claim for cruel and unusual punishment in violation of his Eighth Amendment rights. For this reason, Plaintiff's claim against Defendants Penland, Jordan, Dilla, Furlowe, Wilson, Melvin, Cassell, Gale, Stevenson, Skorza, and Wallace cannot be dismissed at this time. Plaintiff also mentions Lt. Sanders as a defendant, but does not say how Sanders might be personally responsible. This claim against Sanders is dismissed without prejudice.

**Count 4: Deprivation of Property**

Plaintiff relays several instances when he paid for medical treatment he did not receive. Plaintiff signed a copay slip to see a doctor on August 22, but instead saw Nurse Lucas, who told him he would have to wait. Plaintiff asked why they continued to take his money. On August 23, Nurse Melvin visited Plaintiff's cell in response to Plaintiff's request for medical care. She told him he could not receive medical care until he came off crisis watch, however. Plaintiff nevertheless received a copay receipt for Melvin's visit. The only constitutional right that might be implicated by these facts is Plaintiff's right, under the Fourteenth Amendment, to be free from deprivations of his property by state actors without due process of law. To state a

claim, Plaintiff must establish a deprivation of liberty or property without due process of law. But if the state provides an adequate remedy, Plaintiff has no civil-rights claim. *Hudson v. Palmer*, 468 U.S. 517, 530–36 (1984) (availability of damages remedy in state claims court is an adequate, post-deprivation remedy). The Seventh Circuit has found that Illinois provides an adequate post-deprivation remedy in an action for damages in the Illinois Court of Claims. *Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999); *Stewart v. McGinnis*, 5 F.3d 1031, 1036 (7th Cir. 1993); 705 ILL. COMP. STAT. 505/8 (1995). Plaintiff's claims against Defendants Lucas and Melvin are thus dismissed without prejudice to Plaintiff bringing an action in the Illinois Court of Claims.


**Count 5: Due Process**

Plaintiff alleges he was denied a liberty interest to a fair, impartial hearing and not allowed to call witnesses at a hearing before the Adjustment Committee. The hearing was about an inmate disciplinary report written against Plaintiff for disobeying a direct order and refusing housing.

While in segregation on crisis watch, on August 26, 2009, Plaintiff told the psychologist Wallace that he felt the same as when he arrived in segregation, apparently to indicate he was not ready to leave. Yet one hour later C/Os Hicks and Penland came to remove Plaintiff from crisis watch. Evidently Wallace had taken Plaintiff off crisis watch without Plaintiff's knowledge. Plaintiff asked to see Wallace, who arrived 15 minutes later and put Plaintiff back on crisis watch. But Penland wrote Plaintiff an inmate disciplinary report anyway, saying Plaintiff had disobeyed a direct order and refused housing.

A hearing about this incident was held before the Adjustment Committee. Plaintiff told Committee members Brett Klindworth and Carol McBride about the August 26 incident and his having secretly been taken off crisis watch. Plaintiff said Wallace was trying to force inmates off watch. The Committee found Plaintiff guilty, reasoning that Plaintiff was not actually on crisis watch when Hicks and Penland came to move him.

The Committee's final report said Plaintiff did not request witnesses at the hearing, which Plaintiff disputes. He says staff would not allow Plaintiff any writing utensils while on crisis watch, so he had no opportunity to request witnesses. And, while in front of the Committee, Plaintiff says he did request witnesses, but the Committee denied his request. Plaintiff also argues that the Committee was impartial because its report says Plaintiff *had been* on crisis watch, but that he was not on watch when he was ordered to move. Plaintiff maintains he was only off watch for 15 minutes out of an entire month. He believes the Committee is using the 15 minutes when he was forced off crisis watch to justify the inmate disciplinary report.

In *Wolff v. McDonnell*, the Supreme Court set out the minimal procedural protections that must be provided to a prisoner in disciplinary proceedings in which the prisoner loses good time, is confined to a disciplinary segregation, or otherwise subjected to some comparable deprivation of a constitutionally protected liberty interest. 418 U.S. 539, 556–72 (1974).

> *Wolff* required that inmates facing disciplinary charges for misconduct be accorded 24 hours' advance written notice of the charges against them; a right to call witnesses and present documentary evidence in defense, unless doing so would jeopardize institutional safety or correctional goals; the aid of a staff member or inmate in presenting a defense, provided the inmate is illiterate or the issues complex; an impartial tribunal; and a written statement of reasons relied on by the tribunal.

*Hewitt v. Helms*, 459 U.S. 460, 466 n.3 (1983).

Here, Plaintiff alleges he was unable to request witnesses and that the Committee was impartial. However, even if those allegations are true, Plaintiff does not say he was deprived of any constitutionally protected liberty interest. *Wolff* involved the loss of good-time credits. 418 U.S. at 564. Plaintiff omits from his complaint any punishment imposed after the hearing, so this Court cannot determine whether he was deprived of a liberty interest. Plaintiff's due-process claim is dismissed without prejudice.

**Disposition**

**IT IS HEREBY ORDERED** that **COUNT FIVE (DUE PROCESS)** fails to state a claim upon which relief may be granted, and thus is **DISMISSED without prejudice**. **COUNT FOUR (DEPRIVATION OF PROPERTY)** is **DISMISSED without prejudice** to Plaintiff filing in the proper forum. Defendants **WILLIAMS**, **BRADLEY**, **KLINDWORTH**, **HILL**, **OBADINA**, **SCHAFER**, and **BENTON** are **DISMISSED** from this action **without prejudice**.

**COUNTS ONE (EXCESSIVE FORCE), TWO (DELIBERATE INDIFFER-ENCE),** and **THREE (CONDITIONS OF CONFINEMENT)** shall receive further considera-tion.

The Clerk of Court shall prepare for Defendants **HICKS**, **REDDING**, **ALLEN**, **DRUE**, **HILL**, **SKORZA**, **FURLOWE**, **SCHWARTZ**, **WILSON**, **WALLACE**, **STEVEN-SON**, **JORDAN**, **PENLAND**, **DILLA**, **GALE**, **MELVIN**, **LUCAS**, and **CASSELL**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the complaint, and this Order to Defendants' place of employment as identified by Plaintiff. If Defendants fail

to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within **thirty (30) days** from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on Defendants, and the Court will require Defendants to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

It is **FURTHER ORDERED** that, if Defendants no longer can be found at the work addresses provided by Plaintiff, the employer shall furnish the Clerk of Court with Defendants' current work addresses, or, if not known, Defendants' last-known addresses. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the Court's files or disclosed by the Clerk.

It is **FURTHER ORDERED** that Plaintiff shall serve upon Defendants (or upon defense counsel once an appearance is entered), a copy of every pleading or other document submitted for consideration by the Court. Plaintiff shall include with the original paper to be filed a certificate stating the date on which a true and correct copy of the document was served on Defendants or counsel. Any paper that has not been filed with the Clerk of Court or that fails to include a certificate of service will be disregarded by the Court.

It is **FURTHER ORDERED** that Defendants shall timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

**IT IS FURTHER ORDERED** that if judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that at the time application was made under § 1915 for leave to commence this civil action without being required to prepay fees and costs or give security for the same, Plaintiff was deemed to have entered into a stipulation that the recovery, if any, secured in the action shall be paid to the Clerk of the Court, who shall pay therefrom all unpaid costs taxed against Plaintiff and remit the balance to Plaintiff. Local Rule 3.1(c)(1).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to **United States Magistrate Judge Williams** for further pre-trial proceedings.

Further, this entire matter is **REFERRED** to **United States Magistrate Judge Williams** for disposition, as contemplated by Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *should all the parties consent to such a referral.*

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and any opposing party informed of any change in his address; the Court will not independently investigate Plaintiff's whereabouts. This shall be done in writing and not later than **seven (7) days** after a transfer or other change in address occurs. Failure to comply with this Order will cause a delay in the transmission of Court documents and may result in dismissal of this action for want of prosecution. *See* Fed. R. Civ. P. 41(b).

**IT IS SO ORDERED.**

**DATED: August 20, 2012**

  **s/ MICHAEL J. REAGAN**
**MICHAEL J. REAGAN**
**United States District Judge**